John A. Rigg and William Rebmann *v.* The Reading and Southwestern Street Railway Company, James W. Shepp, President, James W. Shepp, Daniel B. Shepp, Vincent S. Seltzer, Secretary and Treasurer, and Vincent S. Seltzer, Appellants.

*Specific performance—Personal property—Equity—Remedy at law.*

However strong, clear and emphatic the language of a contract, however plain the right at law, if a specific performance would for any reason cause a result, harsh, inequitable or contrary to good conscience, the court should refuse such a decree and leave the parties to their remedies at law.

*Corporations—Agreement among stockholders—Pooling agreement.*

Certain stockholders in a corporation may agree to stand together in carrying out an honest business policy consistent with what they believe to be to the best interest of all the stockholders. Such an agreement is not an illegal pooling agreement.

*Equity—Specific performance—Sale of stock of corporation—Remedy at law.*

On a bill in equity to compel a conveyance of the stock of a corporation, it appeared that R., one of the plaintiffs, had purchased the stock, under an agreement between himself and the defendants to promote their mutual interests; that defendants not only actively aided in purchasing the stock, but advanced money to R. for that purpose, and that R. was still largely indebted to them for such advances; that the stock went into their possession to be held by them for the common interest; that R. had agreed with them not to sell to unfriendly parties without giving them the first opportunity to buy; that he did sell knowingly, to the other plaintiff, a hostile party, who knew of the previous arrangements between R. and the defendants, in pursuance of which the stock was purchased and was then in their possession, and who said in the face of it he would take his chances. *Held*, (1) that the plaintiffs had an adequate remedy at law; (2) that the case was not one for a decree for specific performance.

Argued March 1, 1899. Appeal, No. 16, Jan. T., 1899, by defendants, from decree of C. P. Berks Co., Jan. T., 1899, No. 694, on bill in equity. Before STERRETT, C. J., GREEN, McCOLLUM, DEAN and FELL, JJ. Reversed.

Bill in equity for specific performance. Before ERMENTROUT, P. J.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree in favor of plaintiffs.

*Cyrus G. Derr* and *John G. Johnson*, with them *John H. Rothermel* and *Ermentrout & Ruhl*, for appellants.—The verbal arrangement between Rebmann and the Shepps, under which the Shepps purchased the stock in question for Rebmann and advanced the purchase money and broker's commission therefor, whereby Rebmann agreed that he would not sell the stock without giving the Shepps an opportunity to buy, was based upon a sufficient consideration, and was binding upon Rebmann and Rigg: Hoadley v. McLaine, 10 Bing. 482; Wood's App., 92 Pa. 379; Beach on Modern Equity Jurisprudence, sec. 566.

Equity will not compel the specific performance of contracts relating to chattels. The exceptions to this rule are few, and the appellees have not brought their case within any of the exceptions: McGowan v. Remington, 12 Pa. 56; Foll's App., 91 Pa. 437; Goodwin Co.'s App., 117 Pa. 514; Edelman v. Latshaw, 159 Pa. 644; Roland v. National Bank, 135 Pa. 598.

The purpose for which Rigg seeks to possess himself of the shares of stock in question is to obtain the control of the Reading and Southwestern Street Railway, and a court of equity will not make a decree for the specific performance of a contract for the purchase of shares of corporate stock when such shares are sought for the purpose of obtaining control of the corporation, especially when such decree would result in placing one of two competing lines of street railway under the control of the company owning the other line: Foll's App., 91 Pa. 434.

*Richmond L. Jones* and *George F. Baer*, with them *James A. O'Reilly*, for appellees.—The pooling agreement was invalid: Moses v. Scott, 4 So. Rep. 742; People v. North River Sugar Refining Co., 121 N. Y. 582; Cook on Stock and Stockholders, sec. 622.

The pooling agreement having been admittedly invalid, and indeed abandoned by all the parties thereto, Shepp should have delivered the Rebmann certificates to Rigg when the demand was made, and, failing so to do, a court of equity will decree the delivery: Gilpin v. Howell, 5 Pa. 42; Forrest v. Elwes, 4 Ves. 492; Payne v. Burke, cited in note, 2 East, 213; Shepherd

v. Johnson, 2 East, 211; McArthur v. Seaforth, 2 Taunton, 258; Harrison v. Harrison, 1 Car. & Payne, 412; Greening v. Wilkinson, 1 Car. & Paine, 625; Cortelyou v. Lansing, 2 Caines's Cases, 216; Hart v. Ten Eyck, 2 Johns. Ch. Rep. 117; Clark v. Pinney, 7 Cowen, 681; Mechanics' Bank of Alexandria v. Seton, 1 Peters, 299.

The real owner of stock may compel the nominal owner to transfer the stock to him: Smith v. Lee, 77 Fed. Rep. 779.

OPINION BY MR. JUSTICE DEAN, May 8, 1899:

This case is on the equity side of the court; it is an appeal to a chancellor to reach forth his strong hand and take from an alleged wrongdoer, chattels, unjustly withheld from an alleged clean handed innocent owner. The response to the appeal has been favorable and full. It is, in substance, based on these findings of fact:

One William Rebmann, being the owner of 159 shares of stock of the Reading and Southwestern Street Railway Company, on December 8, 1897, for the consideration of $9,687.74, by written contract, sold and agreed to transfer them to John A. Rigg, his coplaintiff. At the time, the certificates of stock were in possession of James W. Shepp and Daniel B. Shepp, who laid claim to them under a verbal contract of sale made with them by Rebmann ten days before the sale to Rigg, to wit: on November 29, 1897; this alleged prior sale was wholly ineffectual to pass title to, or put right of possession in, the Shepps, therefore, the Shepps were ordered to deliver the shares of stock to Rigg.

Assuming, for the purpose of this issue, these to be the established facts, do they, in the face of other established facts, warrant the interference of equity?

How came these stocks into the possession of the Shepps? Rebmann, one of the plaintiffs, testifies as follows:

"Q. You said they advanced the money to purchase this stock? A. Yes, sir. Q. And isn't it a fact that they said to you that they wanted to increase their influence in the company? A. Yes, sir. Q. And that they would put these shares in your hands? A. Yes, sir. Q. And that you should not sell them to any person unfriendly to them without giving them first chance? A. Yes, sir. Q. Was that said? A. Yes, sir; that

was the agreement. I was to stick to the Shepps and that they would stick to me. Q. Was that said at the beginning of these different purchases? A. Yes, sir; I went in with that understanding; that is how I came to get into this affair at all. Q. You knew nothing of this railroad until the Shepps talked to you about it? A. No, sir; I went over the road with Mr. Shepp before it was completed. Q. Before it was completed? A. Yes, sir. Q. The purchase of stock by you was suggested by Mr. Shepp? A. Yes, sir."

James W. Shepp, one of defendants, testified thus:

"Mr. Rebmann started buying shares of the Reading and Southwestern Street Railway Company as early as the fall of 1892 or spring of 1893; it was through my suggestion that he bought shares, and at the time the arrangement was that the shares that he purchased were for our mutual interest, and that at any time he wanted to dispose of his shares they were to come back to either myself or my brother; we asked him to invest because he said he had some money, and we wanted to increase our holdings in the road, and we being friends of his, for that reason we encouraged him to go in with us on a mutual basis. Shares were bought from time to time during 1893 and 1894 at different intervals; we invariably advanced the money to buy the shares, and he would pay us on account as he could. The first sixty-nine shares that we purchased were transferred to him and were in his name on the books of the company; the other ninety shares have never been transferred to him; they never stood in his name; they have always been in my name for the reason that we were not fully paid for them, and for the further reason that we considered them the same as our own, because when Mr. Rebmann wanted his money he could get it at any time for the shares; it was mutually agreed that at any time he needed the money we would return it to him, or, in other words, purchase his stock.

"Q. Was the price at which you were to purchase his stock fixed at any time? A. Prior to November 29, the price was not fixed, but on November 29, the price was fixed at $100 a share. Mr. Rebmann come into our office quite frequently and inquired as to the progress of the road and seemed to be very much interested in it. My brother made him a proposition of $100 a share on November 29, which he told me of the

following day. Q. Were you there when the proposition was made? A. No, sir. Q. You were not there on the 29th, when the proposition was made? A. No, sir; I was not there at that time, on that day. Q. Did your brother report it to you afterwards? A. My brother reported it."

The testimony of D. B. Shepp is in complete accord with that of his brother. As to the main fact, that Rebmann's purchases were made with the understanding, that the stock was to be held to promote their mutual interests,—that is, Rebmann, to use his own language, was to stick to the Shepps and the Shepps were to stick to him, and Rebmann was not to sell to unfriendly parties without giving them the first chance to purchase,—there is no conflict in the testimony; and it is just as undisputed that by reason of the same understanding or agreement the Shepps came into the actual, manual possession of the certificates. Whether by a sale to the Shepps on November 29, Rebmann divested himself of all property in the stock, so that, on December 8, following, he had nothing to sell to Rigg, we will not inquire, and will not here discuss. Their possession was not wrongful; ninety of the shares stood in their name, sixty-nine were under written pledge for a loan of the very money paid for them; under the express testimony of both themselves and Rebmann, up to the date of one or other of the alleged sales, by Rebmann's agreement, they were held for him and them to further their mutual interests. Rigg avers, that Rebmann made an absolute sale to him on December 8; the Shepps reply that he had made an absolute sale to them on November 29, previous. Rigg replies, there was no valid sale to the Shepps, and in this he is supported by a rather equivocal denial of Rebmann, who in this particular, to some extent, contradicts the Shepps. But, it is not disputed, that both Rigg and the Shepps were at about the same time in hot pursuit of Rebmann to get from him the absolute title to these shares; it strikes us, a chancellor would have to strain his conscience somewhat to approve the business methods of either; but Rigg knew from Rebmann that there was a contract between him and the Shepps which clouded Rebmann's right to sell; he did not inquire of Shepp the nature of this contract, but declared he would take the chances of it.

If, then, there be added to the facts found by the learned

judge of the court below, the further facts, that this stock was purchased under an agreement between Rebmann and the Shepps to promote their mutual interests; that the Shepps not only actively aided in purchasing it, but advanced money to Rebmann for that purpose, and that he was still largely indebted to them for such advances; that the stock went into their possession, to be held by them for the common interest; that Rebmann had agreed with them not to sell to unfriendly parties without giving them the first opportunity to buy; that he did sell, knowingly, to a hostile party; that the purchaser knew of the previous arrangement between Rebmann and the Shepps, in pursuance of which the stock was purchased and was then in their possession, yet said he would take his chances, in the face of it; in view of all these facts, is it a case for a decree for specific performance? For let the decree be framed ever so adroitly, that is its substance and effect; and if it were not so, plaintiffs would not be in a court of equity asking for one. Says Beach on Modern Equity Jurisprudence, p. 640, note 2: "However strong, clear and emphatic the language of the contract, however plain the right at law, if a specific performance would for any reason cause a result, harsh, inequitable or contrary to good conscience, the court should refuse such a decree and leave the parties to their remedies at law."

There was no betrayal of Rebmann's confidence by the Shepps. Does it accord, then, with good conscience, that Rebmann shall violate his positive agreement with his coadventurers in the purchase of this stock, and sell it to a hostile party? that party at the time having knowledge of the vendor's bad faith towards his former associates? So far as appears, there was nothing in the arrangement between Rebmann and the Shepps violative of the law or contrary to public policy; one or more stockholders in a corporation may agree to stand together in carrying out an honest business policy consistent with what they believe to be the best interests of all the stockholders; this was not a pooling agreement, to vest the government of the corporation for a definite time in certain members of it, or to yield the control to a few who might dominate regardless of the interests of the many. It was intended to maintain a status of independence for the railway company that it might be operated under the purposes of its charter. We do not think, that Rebmann himself, if the

Shepps had offered to make him whole, could, in the face of his admission, have successfully asserted a right to specific performance with the purpose of assuming a hostile attitude to Shepps; and Rigg, his vendee, with the knowledge he had, is in no more favorable situation.

Nor do we agree with the court below in its conclusion that plaintiff's remedy at law, if his cause of action on the facts be clear, is an inadequate one. We entirely concur with the court, in holding, that in rare cases equity will decree specific performance of a sale of chattels, such as all those enumerated by Justice BELL in McGowin v. Remington, 12 Pa. 56, and in such case as Goodwin Gas Stove & Meter Co.'s Appeal, 117 Pa. 514, where specific performance of a sale of stock in a particular manufacturing corporation was decreed. And in exceptional cases, where gross fraud or forgery has been practised to obtain possession of a chattel, equity will decree restitution. But in nearly all cases the test is, is there an adequate remedy at law? And where the right is clear, is a computation of damages impracticable? The test is not, as seems to have been the thought of the learned court below, the impossibility of attaining sameness of testimony as to the amount of damages, for such a test would practically vest jurisdiction in equity in almost every case for damages on breach of contract for the sale of a chattel. This idea, it is true, seems to be suggested by the remark of PAXSON, J., in Foll's Appeal, 91 Pa. 437, where he says: "The reason for the rule is, that for the breach of a contract of sale of personal chattels, there is an adequate remedy at law. A jury can be in no doubt as to the proper measure of damages. This is especially true of stocks and public securities which have a known market value." Evidently this remark was by way of illustration, and the market value referred to was the stock board or public auction market, about which there could be no difference of opinion, for the injured party could at once replace the stock by paying a purchase price in the open market. But it was not intended to hold, that there was no certainty as to price, except when established by a stock board or auctioneer's sale. The value of a corporation's stock not listed or otherwise offered at public sale depends upon the value of the franchise, improvements and earning power, present and future, of the corporate property. There

is no inadequacy of remedy at law because of mere conflict of testimony as to value; in all such cases, proximate truth or fact is deducible from evidence. Not so with the value of a picture, heir-loom, ancient manuscript or the like. In the case of Goodwin's Appeal, supra, where specific performance for the delivery of stock in a manufacturing company was decreed, the circumstances were said by this Court to be peculiar; damages could not be computed, because the payment for the stock was by instalments extending over a series of years, the amount of payments depending on profits of the corporation. In the case before us, large purchases of stock were made by both parties; it had a value evidenced by many actual sales; it had been largely purchased by Rigg, the plaintiff, as well as by defendants; hence, perhaps, it has acquired also a speculative value. Nevertheless, such a fact is very far from showing that on a question of damages its real value cannot be approximately ascertained. That the motive of plaintiff, the buyer, was to secure control of the railway company, is of no moment in a court of equity, and is no element from which to infer impracticability in computation of damages.

We are of opinion that even if the facts be as found by the court below, equity ought not to take jurisdiction in this case, unless constrained thereto by the fact that plaintiff's remedy at law is wholly inadequate; but we are of opinion the remedy at law is ample. We pass no opinion otherwise, on either the facts or law, as we desire to avoid any prejudgment of a possible future issue between these disputants in an action at law.

The decree is reversed, and the injunction directed to issue by the court below is dissolved; the bill is dismissed at costs of appellees.