**MORTON S. GREENWOOD, v. SOL ROTFORT**

28 So. (2nd) 825
April 23, 1946
Rehearing granted May 23, 1946

January Term, 1946
En Banc

*Thomas H. Anderson,* for appellant.
*George E. McCaskill* and *Walsh & Ellis,* for appellee.

BROWN, J.:

This is an appeal from a final decree ordering the specific performance of a contract.

In Miami, in 1941, Jack Miller and Sol Rotfort, appellee here, formed a corporation under the name of Blue Ribbon Laundry of Miami, Inc., the capital stock consisting of 60 shares, Miller owning 40 shares and Rotfort 20. Miller contributed $9000.00 in cash to the venture, and Rotfort contributed $1500.00 in cash and some trucks and good will, amounting in all to the value of $4500.00. About two months

later Rotford agreed to buy Miller out and to this end he gave Miller a promissory note for $9,000.00 with interest, which was endorsed by Rotfort's brother, to secure which note Miller retained all of the stock in the corporation, and Rotfort executed a formal pledge of the stock for that purpose.

About a month later the corporation was in a very precarious condition, was "about to go under," and Rotfort was in financial difficulties. The corporation was indebted to Rotfort and his brother for back salaries, and they were having great difficulties in paying their help. Rotfort employed a business broker to procure some one to furnish money for the enterprise. The broker brought Rotfort and Greenwood together and at this meeting Rotfort showed Greenwood a statement of the business and the amount of money they were currently losing. It appeared that unless capital was furnished immediately the laundry would not be able to continue in business. In accordance with an understanding with Rotfort, Greenwood advanced $5000.00 to the company, for which he received 31 shares of the stock which Rotfort had pledged to Miller, the latter being still in Miami, and consenting thereto. Miller agreed to rewrite the note and release 31 shares of the 60 shares from his lien. This was done and Rotfort gave Miller a new note for $9000.00, bearing 6 per cent interest, dated August 4, 1941, and payable in installments falling due in 1942 and 1943, the last installment payable May 1, 1943, and Greenwood received 31 shares of the stock, Miller retaining the other 29 as collateral security for Rotfort's note, which note expressly gave Miller a lien on the 29 shares to secure its payment, together with cost of collection and attorney's fees.

The situation of the laundry got worse for a while and Greenwood had to make further advances to the corporation. Rotfort continued as president and general manager of the corporation, he and Greenwood each drawing a salary of $25.00 per week, until August 1942, when Rotfort went into the army. The business conditions of the laundry improved during the last four months of the period of about one year which had elapsed from the time Greenwood came into the company, and during which year Greenwood, in addition to

the initial advance of $5000.00, had advanced $23,375.00 to the corporation. When Rotfort went into the army in August 1942, Greenwood took over the management of the laundry and continued to successfully manage the same up to the time of this litigation. So much so, that Greenwood was paid a salary of $14,000.00 per year for about two years, and the $23,375.00 which Greenwood had advanced to the corporation was repaid.

Rotfort was in Miami on furlough on or about May 10, 1943, and he and Greenwood held a meeting of the stockholders of the company in the office of Attorney John Porte, who was acting as Secretary of the corporation. Greenwood told Rotfort that the outlook was still uncertain, that he had invested considerable money in the business, and would like to buy Rotfort's stock, so that he would be in a position to sell, liquidate or stay open as he thought best. Rotfort agreed to sell and the parties entered into an agreement or bill of sale of said stock, which was still pledged to Miller. This agreement contained a paragraph reading as follows:

"For and in consideration of the sum of $10.00 and other valuable considerations, the seller sells to the buyer, and the buyer purchases from the seller, twenty-nine (29) shares of capital stock of the said Blue Ribbon Laundry Co., of Miami, Inc."

Then followed these words:

"IN WITNESS WHEREOF, the parties hereto have set their hands and seals on the 10th day of May, 1943."

Then followed the signatures of Rotfort and Greenwood, two persons signing their names as witnesses thereto.

Rotfort testified that Greenwood stated to him that Miller was threatening to foreclose his lien on the stock and that it would be better for Greenwood to hold the stock for Rotfort's protection; that he would get the note and tear it up and that the note would be destroyed and that Rotfort would have that much obligation less, and he would let Rotfort work it out with Greenwood over a period of years. This was Rotfort's version. Greenwood's was somewhat different.

Rotfort testified that the $10.00 mentioned in the agreement of sale was not paid to him, but that he understood from

Attorney Porte, who appeared to have been acting as a matter of accommodation for both parties, that the "other valuable considerations" referred to therein had reference to the agreement entered into at the same time and place between the parties, which, omitting the formal first paragraph, reads as follows:

"WHEREAS Morton Greenwood has purchased from Sol Rotfort twenty-nine (29) shares of the capital stock of the Blue Ribbon Laundry Co., Inc., all of which shares of stock are fully paid and non-assessable, Now, THEREFORE,

"In consideration of the premises and of other good and sufficient causes of consideration, both parties agree with each other as follows:

"1. (a) That Morton Greenwood shall not sell, assign, transfer or dispose of the twenty-nine (29) shares of stock of the Blue Ribbon Laundry Co. of Miami, purchased from Sol Rotfort, until he shall have first offered for sale the said twenty-nine (29) shares of stock to Sol Rotfort.

"(b) That such offer shall be in writing and shall state that the offeror offers to sell the said twenty-nine (29) shares of stock held or owned by him, and a copy of such offer, signed by the offeror, shall be sent by registered mail to Sol Rotfort, % Cecelia Rotfort, 2951 S.W. First Avenue, Miami, Florida.

"(c) That Sol Rotfort, to whom such offer be made, as hereinabove provided, shall have a period of thirty (30) days from the time of mailing to him of said offer, within which time to elect to accept said offer, and if he shall elect to accept the same, he shall so signify in writing to Morton Greenwood, and such signification of acceptance shall either be personally delivered or sent by registered mail.

"(d) That if any offer made, as aforesaid, shall be accepted as hereinabove permitted, the said twenty-nine (29) shares of stock so accepted for purchase shall be delivered and paid for by the acceptor in the manner and at the price hereinafter provided.

"2. That the purchase price hereunder of the said twenty-nine shares of stock of the corporation shall correspond to the present amount stated in a note, executed by Sol Rotfort

to Jack Miller, plus interest and costs, and which twenty-nine shares of stock have been pledged as collateral by Sol Rotfort, as security for the payment of said note.

3. That this agreement shall be deemed to be made under the laws of the State of Florida and in all respects, including the matters of validity and performance.

"IN WITNESS WHEREOF, the parties hereto have set their hands and seals, on this 10th day of May 1943."

This instrument was signed by both parties in the presence of the same two witnesses whose names were signed as such on the bill of sale. Greenwood testified that this agreement was drawn and executed at the suggestion of Attorney Porte, but that he agreed to the suggestion, and signed the agreement.

In July of 1943, E. M. Zeidman, a Birmingham attorney, who represented and held a broad power of attorney from Miller, with reference to the pledged stock, came to Miami and was prepared to bring suit against Rotfort to foreclose the pledge of the 29 shares of stock. Greenwood, through Zeidman, procured from Miller an option by which Miller agreed to sell to Greenwood the 29 shares of capital stock of the Blue Ribbon Laundry for $9000.00, $15,000.00 being paid at the time, and the stock, which was put in Miller's name on the books of the Company, was placed in escrow at a bank, and Rotfort's note to Miller was canceled, such cancellation being endorsed on the face of the note in these words:

"Canceled and voided this 30th day of July, 1943." E. M. Zeidman, attorney for J. W. Miller."

The option given by Miller was to run until March 1, 1944. In February 1944, Greenwood paid the balance of the $7500.00 due under his option from Miller, and received from Miller the stock certificate for the 29 shares, which had been pledged by Rotfort to Miller as security for the note for $9000.00 and interest and costs, which Rotfort had given to Miller on August 4, 1941.

In the following May (May 20, 1944), Greenwood sent Rotfort a registered letter, properly addressed and duly signed, as follows:

"Dear Sol:

"In keeping with our Agreement entered into on May 10, 1943, wherein I have agreed not to dispose of the 29 shares of the capital stock of the Blue Ribbon Laundry of Miami, Inc., until I shall have first offered said shares to you in writing, I am hereby addressing this notice to you in accordance with the terms of said Agreement.

"You have thirty (30) days from date of mailing of this notice to purchase said shares of stock for the amount stated in the note, executed by you to Jack Miller, plus interest and costs."

Rotfort testified that he went to Miami, arriving on June 5, 1944. He and Greenwood had lunch on the 9th; that Greenwood told him he wanted his money from Rotfort for the stock he had paid Miller $9000.00 for; that he had a sale for the laundry and "wanted to be all washed up." Rotfort wanted more time to raise the money and consulted Attorney E. P. Ellis, who asked Greenwood for a conference, and on the morning of June 10th, Greenwood came to the attorney's office, and refused any extension of time, and Ellis told him that this stock would be picked up if he had to advance the money himself; that Mr. Ellis asked Greenwood to let him have a financial statement, so Rotfort could get the money from a bank; that Greenwood promised to furnish him a statement on June 12th, and did do so, but refused to leave it with Mr. Ellis; that Greenwood said that the amount due on the note, with interest and costs, would not exceed $10,000.00; and that Rotfort arranged to get the money, and that before Greenwood wrote him a letter on June 13th, cancelling his letter on May 20, 1944, Ellis informed Greenwood that "we have the money ready" and asked for the exact amount due on the note. Greenwood said to call him the next morning; that he did not have the information. That afternoon, June 13th, Rotfort received the following registered letter from Greenwood:

"Having had a prospective sale of the Blue Ribbon Laundry of Miami, Inc., in process of negotiation and in keeping with our agreement of May 10, 1943, I sent you notice on May 20, 1944.

"Inasmuch as this deal has fallen through I have decided to retain any and all shares of capital stock in said corporation.

"I hereby revoke and cancel notice given you in my letter of May 20, 1944."

And, on the same day Greenwood sent Rotfort this telegram:

"Have concluded not to sell stock in Blue Ribbon Laundry of Miami, Inc., and you may therefore disregard notice sent to you on May 20, 1944. The offer that I had has not been accepted by me and you have not complied with Paragraph 1-C of our agreement of May 10, 1943. Notice heretofore given you is hereby canceled and revoked."

On the following day, June 14, 1944, Attorney Ellis sent Greenwood a registered letter reading as follows:

"This will confirm to you that as attorney for Sol Rotfort I have in my hands the funds with which to pay for the repurchase, by Sol Rotfort, of twenty-nine (29) shares of stock which he formerly assigned to you, and which he has the privilege of repurchasing under the terms of your written agreement dated May 10, 1943. Your written notice to him under the terms of Paragraph 1-B has been received by Mr. Rotfort, in which you stated, 'You have thirty (30) days from date of mailing of this notice to purchase said shares of stock for the amount stated in a note executed by you to Jack Miller, plus interest and costs.'

"This may also be considered written notice to you of Mr. Rotfort's election to accept said offer.

"Will you, therefore, advise the writer immediately the exact amount of principal and interest and costs necessary to close the purchase, and advise me where and when I may meet you to pay over the purchase price and receive the stock."

Rotfort also on the same day, June 14, 1945, sent Greenwood this letter:

"Receipt is acknowledged of your letter of May 20, 1944, giving me thirty days notice in accordance with the terms of our written agreement dated May 10, 1943. Your notice informs me that I must purchase the said shares of stock for

the amount stated in a note executed by me to Jack Miller in the sum of $9000.00 plus interest and costs.

"This is to advise you that I am now ready, willing and able to complete said purchase. Kindly issue twenty-nine (29) shares of capital stock of the Corporation to Sol Rotfort, and deliver the same to Mr. E. P. Ellis, Attorney, 707 Olympia Building, who will pay you the amount in cash, upon delivery of the twenty-nine (29) shares of capital stock as aforesaid."

Greenwood refused to deliver the stock and this suit ensued.

On cross examination, Rotfort said that after Greenwood failed to give him a financial statement, so he could get the money from a bank, he had arranged to get, and did get, the $10,000.00 from his friends Heiman and Lichtenstein, upon an agreement that after he acquired the 29 shares of stock from Greenwood, the stock would be equally divided between them, one-third to him, one-third to Heiman and one-third to Lichtenstein; that he had spoken to them about it previously, soon after his arrival in Miami.

The appellant's answer in the court below alleged that Heiman and Lichtenstein were competitors of Greenwood in the laundry business but no evidence to that effect is shown by the transcript.

Appellant offered in evidence the testimony, taken de bene esse after notice to opposing counsel, of one J. C. Fox temporarily in Miami on furlough, who testified that about two months previously he met Lieut. Rotfort at Lake Charles Army Airfield; that he had worked for the Blue Ribbon Laundry and knew Rotfort and they had a long talk; that Rotfort showed him a written agreement which he had entered into with Heiman and Lichtenstein by which they agreed to furnish the money for these shares of stock and *the attorney for the case,* in exchange for which, if the case was won, the stock would be divided equally between the three. This, obviously, was not the legal method of proving the contents of a written contract, though no objection was made, as counsel for appellee did not appear. Counsel for appellant, however, went further, and asked witness Fox this question: "Did Lt. Rotfort confirm orally with you the understanding which

you had obtained from reading the contract that two-thirds of the 29 shares, if he was successful, would be given to Mr. Heiman and Mr. Lichtenstein:" To which, Fox replied: "Yes, he did." But this testimony did not refer to furnishing counsel and was no more than Rotfort himself admitted on the stand. However, Rotfort, while on the witness stand, testified that *he* had employed the attorneys who represented him. The chancellor evidently gave credence to this testimony. Rotfort admitted that he had an agreement with Heiman and Lichtenstein that if they would furnish him the money to pay for the stock, he would transfer two thirds of it to them, one-third to each, if he was successful in his efforts to get the stock.

Counsel for appellant argues that this showed that Heiman and Lichtenstein had acquired such an interest in the subject matter of this suit as to make them necessary parties thereto, and that Rotfort could not maintain the suit and get relief in his name alone. We cannot concur in this view. To a bill for specific performance of a contract, the parties to the contract are, as a general rule, the only proper and necessary parties. Fagan v. Barnes, 14 Fla. 53. Nor was there any privity of contract between the defendant Greenwood and the two parties above named. Their interest in this suit, while very real, is contingent and expectant. This suit can be fully adjudicated without their presence. Steinmetz v. Wisehart, 138 Fla. 753, 190 So. 13. The interest which a party must have in the subject matter of a suit, in order to be a necessary party thereto, is a present, substantial interest, as distinguished from a mere expectancy or a future contingent interest. Green v. Grant, 143 Ill. 61, 32 N.E. 369. See also 39 Am. Jur. 883-4. Furthermore, appellant made no motion in the court below to have these two persons made parties to the suit.

Coming now to the real merits of the case, appellant contends that the contract sought to be specifically performed was without consideration. As shown in the statement of facts, the bill of sale of the 29 shares of stock by Rotfort to Greenwood and the agreement between these two parties with reference to giving Rotfort an opportunity to repurchase the stock under certain conditions were concurrently made. True

it is that at the time Rotfort sold the stock to Greenwood he held a rather tenuous title inasmuch as it had been pledged as collateral to secure a note for $9000.00 which Rotfort had made to Jack Miller, a note which was then partly in default and which Rotfort was not able to pay, all of which Greenwood knew. But in the bill of sale of the stock to Greenwood it is recited that Rotfort was the owner of 29 shares of stock, and was selling it to Greenwood for $10.00 "and other valuable considerations." The agreement, executed at the same time, recited the purchase of the stock by Greenwood from Rotfort, and then said: "In consideration of the premises and of other good and sufficient causes of consideration, both parties agree with each other as follows:" Then follows the agreement therein sought to be enforced, which we will advert to later. This agreement was quite a generous one on Greenwood's part in view of the great uncertainty of Rotfort's being able to pay the $9000.00 note and redeem the stock which Miller held as collateral security. Greenwood lifted Miller's lien on the stock by paying Miller $9000.00 some eight or ten months later and secured possession of the stock. However, at the time the bill of sale and the agreement above referred to were executed, the real ownership of the stock was in Rotfort, and Greenwood saw fit to take a bill of sale from Rotfort and give him in return the agreement hereinabove set forth by which, under certain conditions, Rotfort was given an opportunity to repurchase the stock. No money was paid, but the bill of sale of the 29 shares of stock by Rotfort to Greenwood was executed contemporaneously with the execution and delivery of the agreement and furnished a consideration therefor. This is clearly indicated by the language of these instruments. And if the offer was made and accepted according to the contract, there was mutuality of obligation. 12 Am. Jur. 568; 17 C.J.S. 439. As above stated, there was a consideration for the contract between these parties. See also Peterson v. Chase, (Wis.) 91 N.W. 687; Sayward v. Houghton, (Cal.) 51 Pac. 853, and 52 Pac. 44; Leadbetter v. Price, (Oregon) 202 Pac. 104.

It is further contended that specific performance of this contract cannot be decreed because it does not fix any specific

time within which the right of the plaintiff below to purchase shall be exercised. This contention might be well founded if this were a mere option contract. An option is generally an agreement by which one binds himself to perform a certain act, usually to sell or convey property for a stipulated price, within a designated time, leaving it to the discretion of the person to whom the option is given to accept it upon the terms specified, which, so long as it remains unaccepted, is a unilateral writing lacking in the mutual elements of a contract. But when accepted within the time specified, the offer or option becomes a contract for sale, binding on both parties thereto. A mere offer to sell, not based on a valuable consideration, may be withdrawn at the pleasure of the one making it. Frissell v. Nichols, 94 Fla. 403, 114 So. 431; Cummins v. Beavers, (Va.) 48 S.E. 891; 12 Am. Jur. 524 et seq; 49 Am. Jur. 137-139. The remedy of specific performance of such an offer, not founded on a consideration, can be invoked only upon the theory that the optionee has seasonably *accepted* the offer, and the agreement had thereby ceased to be an option, and had ripened into a mutually binding and mutually enforceable contract. The continued existence of the offer until its acceptance is, however, necessary to make possible the formation of the contract. 12 Am. Jur. 530, 531.

Construing together the two contracts executed by these parties at the same time, May 10, 1943, it appears that Rotfort sold 29 shares of heavily incumbered stock to Greenwood and in part consideration therefor Greenwood agreed in writing that he would not sell or dispose of said stock "until he shall have first offered" to sell said stock to Rotfort; that such offer should be made by Greenwood in writing, signed by the offeror, and sent to Rotfort by registered mail at a named address; that Rotfort should have thirty days within which to *elect to accept* such offer, and if he should elect to accept the same, he should so signify to Greenwood in writing, and that such acceptance should be either personally delivered or sent by registered mail.

So Greenwood agreed not to sell or dispose of the stock without first *offering* to sell it to Rotfort. No time limit was stated, nor was Rotfort bound to accept any offer Greenwood

might make, but if duly accepted the agreement further provided that "the purchase price hereunder" of said 29 shares of stock shall correspond to the present amount stated in Rotfort's note to Jack Miller, plus interest and costs," which 29 shares of stock have been pledged as collateral by Sol Rotfort as security for the payment of said note."

This agreement did not give Rotfort an unconditional right to buy the stock, but it in effect made it incumbent upon Greenwood to give him the opportunity to buy it, at a price fixed by the amount stated in Rotfort's note to Miller, before selling or disposing of the stock to some one else. We think it may fairly be inferred from the wording of the agreement that it was not incumbent upon Greenwood to make such offer to sell to Rotfort until such time as he had the intention to sell or to offer to sell or dispose of the stock to some one else. As to when, if ever, that time would arrive, the contract gives no hint.

The general rule, which does not usually apply in specific performance cases, in that when a contract does expressly fix the time for performance of its terms, the law will imply a reasonable time. 17 C.J.S., 370. And a contract which is uncertain may, after its execution, be rendered certain by practical construction of the parties thereto by their acts thereunder. 17 C.J.S. 367; Sahlburg v. Teague Furniture Co., 100 Fla. 972, 130 So. 432; Bennett v. Williams, 149 Fla. 4, 5 So. (2nd) 51. So Greenwood and Rotfort both, by their actions, showed that they considered that Greenwood's offer to Rotford of May 20, 1944, was made within the time and in the method contemplated by their contract of May 10, 1943. When that offer was made, Rotfort, under the contract, had an option to accept the offer, on the terms stated in the contract, within thirty days from the time the offer was mailed to him, such acceptance to be in writing, and to be delivered either personally or by registered mail. But before the offer was so accepted by Rotfort such offer was withdrawn by Greenwood. One of the vital questions in this equity case is whether, under the contract between the parties, and the facts shown by the record, Greenwood had the right to withdraw this offer so made before it was accepted by Rotfort. We think that he did.

The general rule, as above alluded to, is that an option supported by a consideration may not be withdrawn during the time stipulated for. See 49 Am. Jur. 139; 12 Am. Jur. 528 and cases above cited. No time was stipulated for in the contract as to when Greenwood should, if ever, make his offer, but the contract, in Section 1-(c), did provide that if and when the offer was made Rotfort had thirty days from its mailing within which to accept such offer in writing, such writing to be delivered personally or by registered mail. But appellant contends that when section 1-(c) is construed in connection with section 1-(a) of the contract, Greenwood had the right to withdraw the offer at any time before it was accepted under the provisions of sec. 1-(c); that as the primary intent of the contract, as shown by paragraph 1-(a), was that if Greenwood intended to sell the stock, he should first offer it to Rotfort before offering or selling to anyone else, in the form and manner as provided by Sec. 1-(c), it naturally follows that if Greenwood, after making the offer changed his mind and decided not to sell the stock to any one else before the written offer to Rotfort had been accepted in writing, he, Greenwood, then had the right to withdraw such offer, or to cancel it; that whatever right Rotfort may have acquired under the agreement was contingent upon Greenwood's intention to sell to some one else the particular shares he had bought from Rotfort.

We are of the opinion that the record clearly sustains this contention. Manifestly the purpose of the contract to allow a repurchase by Rotfort was executed with the intent that it should become binding on Greenwood only in the event he decided, after the issuance of the stock to him, either to bring some one back into the business or to part with the business altogether. The offer of an opportunity to repurchase was thereafter made by Greenwood to Rotfort because of the fact that he then had pending a prospective sale of his whole interest. Negotiations for sale to a third party presently fell through, and Rotfort, not meanwhile having accepted the offer to allow him to purchase, such offer was withdrawn. We think this action by Greenwood was entirely within the spirit and intent of the parties to the contract.

Appellant relies strongly upon the able opinion in the frequently cited case of Stay v. Tennille, 159 Ala., 514, 49 So. 238 (1909). Incidentally, the appellant in that case was represented by this writer's law firm. Specific performance was denied. The contract between the three stockholders of the corporation in that case was quite similar to the one here, though not as specific as to the time and manner of making the offer. It provided that in the event either of the three stockholders desired to sell his stock, or any part of it, he should first offer the same for sale to the other two parties, or either of them, and give them the option to buy said stock before offering it to any one else, or placing it upon the market. The agreement sought to bind the parties and their personal representatives in case of death. The appellant was administratrix of one of the parties to the contract. The consideration recited was one dollar each to the other in hand paid and the mutual interests and protection of the parties. While the opinion in the cited case is persuasive to some extent here, a careful reading of the opinion shows some important factual differences from the case at bar.

Appellant's last contention is that a court of equity should not grant specific performance of the facts in this record, which show that two outsiders, Heiman and Lichtenstein, put up the necessary $10,000.00 to enable Rotfort to get the stock, pursuant to which agreement, if Rotfort wins out in this suit for specific performance, these strangers to the contract will get two-thirds of the stock which was and is the subject matter of the option contract with Greenwood which Rotfort is seeking to have specifically performed.

Regardless of the procedural question already discussed as to whether or not Heiman and Lichtenstein should have been joined as necessary parties plaintiff, we think this last contention deserves careful consideration. At the time the contract of May 10, 1943 was entered into by appellant and appellee, they were virtually partners in the laundry business, one owning 31 shares of the stock and the other 29 shares, and there was nothing to indicate that either of them ever dreamed of any such eventuality as that contemplated by Rotfort's agreement with Heiman and Lichtenstein. When

two persons own all the stock in a business corporation in nearly equal proportions, it is usually referred to as a closed corporation and has many of the characteristics of a partnership. In such a situation, when one of them buys the other's stock upon an agreement not to sell to any one else without first giving the other an option to buy it back at a stated price, the option thus given is not transferable, but is *personal* to the optionee. 12 Am. Jur. 532; 17 C.J.S. 372; Frissell v. Nichols, 94 Fla. 403, 114 So. 431. And in this case it was so intended. While such an option remains in effect, it cannot be assigned to any one else, either directly or indirectly, or conditionally, without the optionor's consent. To hold otherwise would, in nearly all cases, and certainly in this case, defeat the intent and purpose of the option agreement and permit other persons, who may be highly objectionable to the optionor, to reap the benefit thereof, and in this case, permit them to come into the corporation as stockholders with all the legal rights pertaining to stock-ownership, including of course the right to examine the company's books and records.

The evident purpose of the agreement between Greenwood and Rotfort was to enable Rotfort to get back into the corporation if Greenwood got to the point where he was willing to admit others. In this situation Rotfort was given the first choice. This choice was that *he* should be admitted, not that he could bring *others* with him. We think this intention fairly deducible from the papers executed by the appellant and the appellee on May 10, 1943, the circumstances leading up to it and the situation of the parties at the time. In Frissell v. Nichols, Supra, this Court said:

"It is competent for the parties to make any contract a personal one, no matter what the subject matter. If the intention is manifested by the parties in express terms in the contract itself, it effects the same object as where the law implies the intention from the subject matter. Accordingly where by express terms the parties have excluded the idea of a substituted performance, no question upon the subject matter of the contract can arise."

The equitable remedy of the specific performance of a contract is governed by equitable considerations so completely

that the granting of relief is generally said to be discretionary, and is never granted unless it is in accordance with equity and good conscience. Specific performance is not a matter of right, but rests in the sound judicial discretion of a court of equity. 49 Am. Jur. 69. Equity, in decreeing specific performance, requires not only that the contract be just in its provisions, but that all the consequences of specific performance thereof be likewise equitable and just. Specific performance will not be decreed where it would violate the spirit of the contract, or defeat the object for which the contract was made, or would operate unjustly. 49 Am. Jur. 72-74. See also in this general connection Baruch v. W. B. Haggerty, Inc., 137 Fla. 799, 188 So. 797; McCutcheon v. National Acceptance Corp., 143 Fla. 663, 197 So. 475, 130 A.L.R. 915.

In the case of Rimes v. Rimes, 152 Ga. 721, 111 S.E. 34, 22 A.L.R. 1030, it was held that, as a general rule, equity will not decree specific performance of contracts relating to personal property, and that in order to sustain a bill for specific performance of such a contract, it is necessary to allege some good reason in equity and good conscience to take the case out of the general rule. That case dealt with a contract for the sale of corporate stock. Appended to the report of this case there is a rather exhaustive note on this subject, beginning at page 1032 of 22 A.L.R. Among the cases cited in the note is that of Rigg v. Reading, etc. R. Co., 191 Penn. 298. 43 Atl. 212. In that case a person purchased stock for another in his own name under an agreement that the purchase was for the mutual interest of both. The other party, in violation of his agreement, sold the stock to an unfriendly person who knew of the agreement, but who said he would take his chances in making the purchase. The court held that under the circumstances specific performance would not be decreed. We repeat that in this case it certainly could not have been the intent of the parties at the time of the agreement of May 10, 1943, that Rotfort, if the offer was made and accepted, should sell or agree to sell this stock as he pleased and thus put Greenwood into virtual partnership with persons not of his own choosing. This doubtless was the reason that Greenwood withdrew his offer before Rotfort had actually accepted it in the manner required by the contract.

For the reasons above stated, we reach the conclusion that on the pleadings and the evidence the learned chancellor should have denied specific performance and left the plaintiff to whatever remedy he might have at law.

Reversed, with directions to dismiss the bill.

CHAPMAN, C. J., THOMAS and SEBRING, JJ., concur.

TERRELL, BUFORD and ADAMS, JJ., dissent.

### ON REHEARING GRANTED

PER CURIAM:

For the second time we have carefully considered the entire record in connection with this controversy. We have again read the testimony of all the witnesses and studied the exhibits offered by the parties and now appearing in the record. The briefs of counsel have been re-examined and the authorities cited considered in light of the interest and several contentions of the respective parties. The conclusion by us reached in light of the entire record and the applicable authorities is that the decree appealed from is free from error and should be affirmed.

It is therefore ordered, on rehearing granted, that our previous opinion and judgment of reversal be vacated, set aside and held as naught and that the decree appealed from be affirmed.

It is so ordered.

CHAPMAN, C. J., TERRELL, BUFORD and ADAMS, JJ., concur.

BROWN, THOMAS and SEBRING, JJ., dissent.

### ON REHEARING GRANTED

PER CURIAM:

Pursuant to rehearing granted, we have again considered the record herein in the light of briefs filed and oral argument presented.

Having so considered of our judgment, it is ordered that our judgment entered herein on June 11th, 1946 be and the same is adhered to.

So ordered.

CHAPMAN, C. J., TERRELL, BUFORD and ADAMS, JJ., concur.

BROWN, THOMAS and SEBRING, JJ., dissent.