## Baran v. Baran

*Henry Thalenfeld, Conrad A. Falvello,* for plaintiff.
*John E. Cotsack,* for defendant.

FARRELL, J., April 28, 1947.—Plaintiff's bill seeks specific performance of a written contract made by and between plaintiff and his two brothers, owners of upwards of 95 percent of the outstanding stock of Luzerne and Carbon County Motor Transit Company, a Pennsylvania corporation, with principal office in the City of Hazleton. At the time the agreement was entered into July 22, 1941, the three brothers, Wasil Baran, plaintiff, Michael Baran, defendant, and John Baran, who has now disposed of his stock to Michael, each owned 315 shares of the stock. They agreed in said written contract to vote for one another as directors and officers, namely, Wasil, president, John, vice president and secretary, and Michael, treasurer, at a monthly salary of $100 each so long as each owned 315 shares of the stock. The agreement was faithfully kept for four years, 1942 to 1945 inclusive. In June 1945 John sold his 315 shares to Michael (not

prohibited by the agreement) and in January 1946 Michael transferred 30 shares to his wife, Anna. At the annual meetings in January 1946 and January 1947 defendant Michael had himself elected president, excluding plaintiff who now seeks restoration to said office and its emoluments by compelling specific performance by defendant.

Defendant has filed preliminary objections, contending chiefly that the contract is unenforcible because it is against public policy and also contending that the contract has been terminated by the transfer of John's 315 shares to Michael. There are also some other less important objections.

We are satisfied from a careful examination of the agreement and of the authorities that the agreement is not against public policy. The corporation was owned at the time by the three brothers in equal shares, the agreement was for the laudable purposes of preserving harmony and promoting the business of the corporation and it was drawn by the same counsel who are now representing the respective litigants, said counsel's names appearing on the agreement as subscribing witnesses. The evident care in the clear language employed in the agreement and the exceptional thoroughness and excellence of the briefs submitted indicate that at the time of making the written agreement the question of public policy and other questions of the contract's enforcibility were considered and anticipated; and it was evidently considered by both counsel who collaborated in drawing the agreement that it would be adequate to meet the test of future objections in the event of attempted breach. This we must assume from the care and pains counsel took to protect the interests of their respective clients and to preserve harmony in the management of the corporation.

We agree with plaintiff's counsel that the phrase "public policy" has been much overworked in attempts

to set aside and invalidate certain contracts. Defendant relied on this contract for four years to protect his rights and interests in the corporation when he held a minority of the stock. Now when the majority of the stock with its voting power has passed to him, it does not come with persuasive grace from him to repudiate his contract on the ground that it is against public policy.

"Public policy" is a term of vague and uncertain meaning, which it pertains to the lawmaking power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy unless the transaction contravenes some positive statute or some well-established rule of law. Sir George Jessel as master of the rolls said in Printing & Numerical Registering Co. v. Sampson, L. R. 19 Eq. 462, 465:

". . . if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice."

It is not in violation of any rule or principle of law for stockholders, who own a majority of the stock in a corporation, to cause its affairs to be managed in such way as they may think best calculated to further the ends of the corporation, and for this purpose to appoint one or more proxies, who shall vote in such a way as will carry out their plans. Nor is it against public policy for two or more stockholders to agree upon a course of corporate action, or upon the officers whom they will elect; and they may do this either by themselves or through their proxies, or they may unite in the appointment of a single proxy to effect their purpose: Smith et al. v. San Francisco & N. P. Ry. Co. et al., 115 Cal. 584, 47 Pac. 582.

There is no Pennsylvania case precisely in point but there are numerous Pennsylvania authorities upholding the same principle in relation to voting trusts. The Massachusetts case of Hayden v. Beane, 293 Mass. 347, 199 N. E. 755, is closely analogous to the instant case. Defendants owned the controlling shares of a corporation and agreed to sell some shares to plaintiff and to elect him a director, president and general manager of the corporation. The agreement was consummated and carried out. After a period of time, however, defendants broke the agreement. Plaintiff brought a bill for specific performance to require defendants to re-elect him to the various offices set out in the agreement. Defendants contended that the agreement so to vote their stock was illegal and against public policy and filed a demurrer. The lower court overruled the demurrer, which action was sustained by the Supreme Judicial Court of Massachusetts. In holding the agreement enforcible, the court said (p. 351) :

"It is evident from these provisions of the contract that the individual defendants believed that the best interests of the corporation required that the plaintiff be elected to these offices and that he should serve as its general manager for a term of at least seven years. The agreement so far as appears was entered into by the parties in good faith with the mutual understanding and belief that it would result in benefit to the corporation and to the stockholders. We are unable to find that it was against public policy or illegal on any other ground. . . ."

A good example of the extent to which a court of eminent authority has gone to sustain shareholders' agreements involving control of a corporation is found in Clark v. Dodge, 269 N. Y. 410, 199 N. E. 641. Clark owned 25 percent and Dodge 75 percent of the two corporations involved. They agreed that Dodge would so vote his controlling shares in his lifetime, and after

his death his trustee should vote them, that: (1) Clark should be elected a director, (2) the board of directors would elect and continue Clark as general manager as long as he should be "faithful, efficient and competent", (3) that Clark would receive one fourth of the net profits of the corporation, and (4) that no unreasonable salaries would be paid others to reduce Clark's profits. Sometime later Dodge refused to continue Clark as a director and general manager or to continue the profits to Clark. Clark filed a bill for reinstatement as director and general manager, for an accounting of the profits and for an injunction against further violations. The lower court refused relief but was reversed by the appellate court, which sustained the bill. It was held that the contract was not in conflict with public policy nor with the statutory provision that a corporation shall be managed by its board of directors.

The true test of the question here involved is whether or not the contracting parties might lawfully have done what they contracted to do. There is no doubt that the three brothers might have voted for and elected one another to the designated offices. Hence they could bind themselves to such action by contract. So exalted an authority as the late Mr. Justice Holmes of the United States Supreme Court, when he was a justice of the Massachusetts Supreme Court, discussed a similar situation in Brightman v. Bates, 175 Mass. 105, 55 N. E. 809. There shareholders owning a majority contracted to vote as a unit for a board of directors nominated by a certain committee. Mr. Justice Holmes said (p. 810):

". . . we pass to the question whether the latter agreement is unlawful on its face, bearing in mind that, unless it is unlawful on its face, it has the advantage of a finding in favor of the plaintiff. In dealing with this question it does not need to be said that com-

bination of common interests is necessary, and constantly is taking place. It is as legitimate for a majority of stockholders to combine as for other people. The fact that they expect 'gain and advantage' (in the words of the syndicate agreement) to accrue to them does not make the combination unlawful. That expectation and intent would have that effect only if the gain was to be at the expense of the corporation, or in some way was intended to work a wrong to the other stockholders. No such intent appears, and, although it is impossible not to view such an arrangement with suspicion, it is also impossible to let suspicion take the place of proof."

If stockholders want to make their power felt, they must unite. There is no reason why a majority should not agree to keep together.

That equity will give relief by granting specific performance has been held by numerous cases in Pennsylvania where shareholders bound themselves to transfer shares in a closely held corporation: Goodwin Co.'s Appeal, 117 Pa. 514; Northern Central Ry. Co. v. Walworth et al., 193 Pa. 207; Sherman v. Herr, 220 Pa. 420, 423; Reid et al. v. Rogers Coal Co. et al., 275 Pa. 501; Eichbaum v. Sample, 213 Pa. 216; Tintner v. Tintner et al., 24 Luzerne 351; Rigg v. Railway Co., 191 Pa. 298.

We find no merit in the contention that the agreement has been terminated by John Baran's transfer of his stock to defendant. The only effect of John Baran's selling his stock to defendant is that John was relieved of his contractual obligation and lost his claim to voting support from his two brothers. He is therefore now a stranger to the contract and hence was not named a party defendant in the action. Defendant's contention that the transfer of John's shares terminated the contract is based upon the following provision therein:

"It is further understood, covenanted and agreed by the parties hereto that each will vote for the other at shareholders' meetings for the election of directors and at directors' meetings for the election of officers to retain each in the office and at the salary as above provided, *for as long as each owns the same number of shares of said corporation as above recited.*" (Italics supplied.)

Defendant apparently interprets this provision to mean that if a party sells his shares the agreement is ipso facto terminated as to all of the parties. But the phrase "for as long as each owns the same number of share" refers only to the words "to retain each in the office and at the salary as above provided"; that is to say, the language clearly implies that all must vote to retain a party in his office only as long as that party retains his stock interest (which plaintiff has retained). If one disposes of his stock he can no longer claim voting support from the other signatories.

We deem it unnecessary to discuss at length the remaining objections, which are incidental and relatively unimportant. The main questions are whether the contract is against public policy and whether equity will furnish relief. It is our opinion that the contract is not against public policy and that equity will furnish relief. Accordingly,

Preliminary objections to plaintiff's bill dismissed and defendant directed to answer to the merits within 30 days from the filing of this decision.

### Decree nisi

Now, February 1, 1947, upon consideration of the foregoing case, it is ordered, adjudged, and decreed that the bill be dismissed at the cost of plaintiff. Unless exceptions are filed within 10 days after notice of the entry thereof, this decree nisi shall be entered as the final decree.