Donald N. DENSON, Plaintiff–Appellant,

v.

J.E. STACK, Jr., Defendant–Appellee.

Nos. 91–3405, 91–3922.

United States Court of Appeals,
Eleventh Circuit.

Aug. 13, 1993.

Sam Daniels, Miami, FL, for plaintiff-appellant in 91–3405.

Bert Moore, Moore, Kessler & Moore, Niceville, FL, Glenn Gates Taylor, Jackson, MS, for defendant-appellee.

Mahoney Adams & Criser, John E. Steele, William S. Graessle, Jacksonville, FL, Daniels & Talisman, P.A., David B. Pakula, Sam Daniels, Miami, FL, for plaintiff-appellant in 91–3922.

Before KRAVITCH and BIRCH, Circuit Judges, and CLARK, Senior Circuit Judge.

BIRCH, Circuit Judge:

This appeal arises from a real estate contract for the sale of timberland in Levy County, Florida. The buyer, appellant-plaintiff Donald N. Denson, appeals the district court's finding that he breached the contract and, therefore, forfeited his earnest money deposit. Denson also appeals the district court's award of attorney's fees and costs to the seller, appellee-defendant J.E. Stack, Jr. We REVERSE the district court's decision and REMAND for further proceedings.

## I. BACKGROUND

### A. Facts

On June 30, 1990, Denson, as trustee for a group of individuals, signed a contract to purchase approximately 7,500 acres of timberland owned by Stack and known as Devil's Hammock. Devil's Hammock is located in Levy County, Florida, and is bisected by the Waccasassa River. The purchase price was $7,000,000 of which a $300,000 earnest money deposit was put into an escrow account. Stack was required to deliver evidence of marketable title in the form of a title insurance commitment from a qualified title insurer. The commitment was to insure Denson for the purchase price. The contract provided that certain title exceptions would

be acceptable to Denson and required Denson to object to any other title defect within five days of receiving the title commitment. If such an objection was made, Stack was required to use diligent efforts during the next 120 days to remove the title defects. If Stack was unable to remove the defects, then Denson had the option of either accepting the title as it was or demanding a refund of the deposit. The closing date was to be on or before September 15, 1989. Unless both Denson and Stack otherwise authorized the bank in writing, the escrow agreement instructed the bank to transfer the $300,000 and accumulated interest to Stack after September 15, 1989. Finally, the contract provided that, in any litigation connected with the contract, the prevailing party was entitled to recover attorney's fees and costs.

On August 24, 1989, Stack sent Denson a title commitment issued by Stewart Title Guaranty Company ("Stewart Title"). The title commitment contained a number of exceptions, only two of which are relevant to this appeal. Exceptions 18 and 19 stated that the title insurance commitment was:

18. Subject to the inalienable rights of the State of Florida and the United States of America under its control of navigation and commerce as to any portion of the lands described in the commitment which were created by artificial means and/or accretions thereto.

19. Subject to the inalienable rights of the State of Florida and of the United States of America to any portion of land described in the Commitment which are marshland and/or meadowland.

R2–49–15–16. Denson received the title commitment on August 28, 1989. On August 30, 1989, Denson advised Stack by letter that these sovereignty exceptions were unacceptable.

In a letter dated September 12, 1989, Stack stated that the closing scheduled for September 15, 1989, would not occur until a resolution to the objections was worked out, but that the contract would not be affected despite the lack of a closing by September 15, 1989. On September 15, 1989, Denson and Stack executed an extension of the escrow agreement from September 15, 1989, to September 29, 1989.

In late September, the Florida Department of Natural Resources ("DNR") advised Stack that its position was that the State of Florida owned all lands lying below the ordinary high water mark of any watercourse that was navigable at the formation of statehood in 1845. The DNR also advised Stack that it had no current position on whether the portion of the Waccasassa River which ran through Devil's Hammock had been navigable in 1845 and, therefore, could not disclaim ownership of a portion of Devil's Hammock.

In early October, Stewart Title amended the title commitment by consolidating and restating exceptions 18 and 19. The new sovereignty exception stated that the policy did not insure against:

Any titles or rights asserted by anyone including but not limited to persons, corporations, governments, or other entities, to tide lands or lands comprising the shores or bottoms of navigable rivers, lakes, bays, ocean or gulf, or lands beyond the line of the harbor or bulkhead lines as established or changed by the United States Government or water rights, if any, including rights to marshlands and wetlands.

R2–49–18. Despite the amendment, Denson continued to object to the exception because of the State of Florida's possible claim. Stack, however, advised Denson that the exception was standard and that the closing should occur on October 16, 1989. Denson refused and argued that Stack was unable to convey marketable title.

During November and December, Stack attempted to remove the title defect. Stack hired Lee Mills to determine the high water mark of the Waccasassa River throughout Devil's Hammock. Mills determined that approximately 212 acres fell below the high water mark. When the DNR was presented with this information, it informed Stack that, if another expert acceptable to the DNR confirmed Mill's survey, then the DNR would disclaim all land above the ordinary high water mark. Luther Holloway, an expert acceptable to the DNR, was then asked to determine the high water mark. Holloway

found that up to 2,500 acres of land, or one-third of Devil's Hammock, might be under the high water line. Holloway, however, made no determination as to whether the Waccasassa River was navigable in 1845. Thus, the DNR was only willing to disclaim ownership to two-thirds of Devil's Hammock.

Having failed in his attempt to persuade the DNR to disclaim its putative interest in Devil's Hammock, Stack informed Denson in late December 1989, that he was considering bringing suit against the State of Florida to quiet title. Stack decided against pursuing this option in January 1990, after he was advised that such a suit might take a number of years and cost over $1,000,000. Stack then approached Stewart Title and requested that it remove the sovereignty exception. Stewart Title offered to remove the exception if Stack would give it an indemnity agreement secured with a $5,000,000 mortgage. Stack rejected the proposal. Stack also contacted other title insurance companies, but no company would insure the title without including a sovereignty claim exception. Finally, Denson and Stack discussed alternative methods of closing on the property. Denson suggested that they close on the entire tract of land, but that the amount due on land below the high water mark be put in escrow in case the State of Florida later asserted a claim to this land. These discussions were fruitless.

In February 1990, the DNR informed Stack and Denson that, after research, its position was that the portion of the Waccasassa River running through Devil's Hammock was navigable in 1845. The DNR, thus, asserted that the State of Florida owned that part of Devil's Hammock which was below the high water mark of the Waccasassa River. Coupled with Holloway's survey results, the DNR was claiming ownership of approximately one-third of Devil's Hammock. Despite this development, Stack demanded closing on February 20, 1989, and again on March 6, 1990. Denson refused to close and demanded that Stack file suit to remove the title defect.

On March 8, 1990, the bank in control of the escrow account transferred the $300,000 earnest money deposit and accumulated interest from the escrow account to Stack's personal account. The bank then applied this money to Stack's other debts owed to the bank. Upon learning of the transfer, Denson demanded that Stack either file suit or return the deposit and interest. Stack refused and this lawsuit followed.

### B. *Procedure*

Denson's suit against Stack sought specific performance or, alternatively, monetary damages for breach of contract. Denson also sought damages under the civil theft statute. Fla.Stat.Ann. § 772.11 (West Supp.1990). During trial, Denson withdrew his claim for specific performance.

At the conclusion of a bench trial, the court found that Devil's Hammock was not encumbered by any claim by the State of Florida because the Waccasassa River was not navigable through Devil's Hammock, that Stack complied with all conditions imposed upon him by the contract and was prepared to transfer marketable title, and that Denson breached the contract by refusing to close. Stack was awarded the $300,000 and accumulated interest as the liquidated damages for Denson's breach. The court also found that Stack was not guilty of civil theft because he did not know of, counsel, or authorize the bank's transfer of the escrow money to his personal account. Finally, the district court held that Stack was entitled to attorney's fees and costs under both the terms of the contract and the civil theft statute.

A separate hearing was held to determine the amount of Stack's attorney's fees and costs. After hearing objections from Denson, the district court awarded $151,281.70 in attorney's fees and $2,559.10 in costs. Denson appeals both the district court's judgment and award of attorney's fees and costs.

## II. DISCUSSION

### A. *Breach of Contract*

██ The contract for the sale of Devil's Hammock required Stack to convey marketable title to Denson. Denson claims that the threatened claim by the State of Florida to all land lying below the ordinary high water mark of rivers that were navigable in 1845

renders Stack's title to Devil's Hammock unmarketable. Stack contends that the district court properly found that the his title was unencumbered by any claim of the State of Florida. We review the district court's factual finding for clear error, while independently evaluating its legal conclusions. *Wheeler v. City of Pleasant Grove*, 896 F.2d 1347, 1350 (11th Cir.1990) (per curiam).

In Florida, title is marketable if it is:

such as to make it reasonably certain that it will not be called in question in the future so as to subject the purchaser to the hazard of litigation.... It must be, as is sometimes said, a title which can be sold to a reasonable purchaser or mortgaged to a person of reasonable prudence, and which is not subject to such a doubt or cloud as will affect its market value.

*Adams v. Whittle*, 135 So. 152, 155 (Fla. 1931); *Chafetz v. Price*, 385 So.2d 104, 106 (Fla.Dist.Ct.App.1980). The Florida Supreme Court has stated that it is an "uncontroverted legal proposition" that the State of Florida "received title to all lands beneath navigable waters, up to the ordinary high water mark, as an incident of sovereignty, when it became a state in 1845." *Coastal Petroleum Co. v. American Cyanamid Co.*, 492 So.2d 339, 342 (Fla.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987); *see Marine One, Inc. v. Manatee County*, 898 F.2d 1490, 1492 (11th Cir.1990). The *Coastal Petroleum* decision formed the basis for Denson's objection to the sovereignty exception in the title insurance commitment. If the Waccasassa River was navigable in 1845 through Devil's Hammock, the State of Florida would own all land lying below the ordinary high water mark of the river.

When presented with the title insurance commitment, Denson objected, contending that the title to Devil's Hammock was not marketable. Consequently, Stack had 120 days to remove the defect from the title. Without conceding that the sovereignty exception rendered his title unmarketable, Stack approached the DNR and attempted to have them disclaim any ownership to the portion of the Waccasassa River running through Devil's Hammock. The DNR refused and stated that they held no position on whether the Waccasassa River was navigable in 1845. The DNR, however, did state that if the Waccasassa River was navigable in 1845, then it was their position that the State of Florida owned all land lying below the ordinary high water mark. By early February, 1990, the DNR's position changed. In a letter to Denson, the DNR stated that the Waccasassa River was navigable in 1845 throughout Levy County, the county in which Devil's Hammock was located, and, therefore, Florida owned all land lying below the river's ordinary high water mark. This position combined with the survey results of Holloway, the DNR approved expert, meant that the State of Florida was claiming ownership to nearly one-third of Devil's Hammock.

The impact of Florida's claim was significant. Stewart Title was unwilling to remove the sovereignty exception from the title commitment unless Stack gave the company an indemnity agreement secured with a $5,000,-000 mortgage. Additionally, no other title insurance company contacted by Stack would insure the title to Devil's Hammock without the sovereignty exception.

Despite this evidence, the district court held that Stack possessed marketable title to Devil's Hammock. The district court, however, realized that its decision was not binding on the State of Florida because the State of Florida was free to pursue its claim at some future date. Based upon all of these factors, we conclude that the district court clearly erred in finding that Stack possessed marketable title to Devil's Hammock. It was not reasonably certain that the title to Devil's Hammock transferred by Stack would be free from future claims. In fact, any purchaser of Devil's Hammock would be faced with Florida's claim for nearly one-third of the tract. According to Stack's own counsel, a lawsuit resulting from this claim would last years and cost over $1,000,000. Although the contract provided that Denson would accept title subject to certain exceptions, none of the exceptions included Florida's claim of ownership of nearly one-third of the property. Therefore, Stack was not in a position to convey marketable title. It appears to this court that the district court, in focusing on

Florida's putative claim, lost sight of the determinative issue in the case which was whether Stack could convey marketable title to Denson[1].

The fact that the DNR's final position was not known until February 1990, is inconsequential. The initial title commitment contained a sovereignty exception. By the fall of 1989, both parties were aware that this exception encompassed the possibility of a claim to a portion of Devil's Hammock by the State of Florida. The DNR's February letter merely clarified the fact that Stack could not convey marketable title at the end of the 120–day period.

■ Denson had two options when Stack was unable to produce marketable title after the 120–day period. First, he could accept title as it then existed. Second, he could have demanded a refund of all monies paid. There was no time constraint placed on the exercise of these options. The district court found that Denson did not demand a refund of his deposit in compliance with the terms of the contract.

■ The general Florida rule is that when a contract does not expressly fix the time for performance of its terms, the law will imply a reasonable time. *Greenwood v. Rotfort*, 158 Fla. 197, 28 So.2d 825, 831 (1946); *Fleming v. Burbach Radio, Inc.*, 377 So.2d 723, 724 (Fla.Dist.Ct.App.1979). Throughout the fall of 1989, Denson and Stack attempted to resolve Denson's objections to the sovereignty exception. These attempts continued into January and February 1990, after the expiration of the 120–day period. After learning that the bank had transferred the $300,000

earnest money with interest from the escrow account to Stack's personal account, Denson immediately objected and requested that Stack either return the money or file a suit to quiet title against the State of Florida. After Stack refused to file suit, Denson requested the return of the $300,000 and interest.

The district court's finding that Denson did not act to recover the deposit in a timely manner is clearly erroneous. Denson acted to recover his deposit within a reasonable period. Both parties attempted to find a solution to the sovereignty exception even after the 120–day period. Denson should not be penalized for failing to immediately demand the return of the earnest money when both parties were acting in good faith to close the transaction. Therefore, Denson is entitled to the return of the $300,000 and interest.

In summary, the district court improperly concluded that Stack possessed marketable title to Devil's Hammock and that Denson did not timely demand a refund of the earnest money deposit. Because Stack could not convey marketable title, Denson had the right either to take the title with the defect or to demand the return of his deposit. Denson demanded the return of the deposit after further attempts between Denson and Stack to close the deal were unsuccessful and when it became clear that any additional efforts would be futile. Because this demand was made within a reasonable time period, Stack was required to return the $300,000 and accumulated interest.

1. The dissent focuses on the district court's determination that the Waccasassa River was not navigable through Devil's Hollow and, therefore, that Stack possessed marketable title. If the district court was ruling in a quiet title action between Stack and the State of Florida, we might agree with its conclusion. Instead, it was called upon to determine whether Stack was in a position to convey marketable title *at the time of closing*. The proper frame of reference is what information the parties had at the time of closing. As noted above, title is marketable if it is not subject to a doubt or cloud that affects its value or if it is reasonably certain that it will not be called into question in the future. Based on the information available to the parties at closing, including the two letters from the State of Florida, the survey of the state approved expert, the unwillingness of the title company to withdraw the exception without a $5,000,000 indemnity, and $1,000,000 estimated cost of a lawsuit against the state, the value of the property was clearly impaired, and there was no reasonable certainty that Florida would not challenge the title. Moreover, in such litigation the issue gratuitously resolved by the district court in this case would not be binding on Florida since it was not party to this litigation. Common sense suggests that this purchaser did not contract to buy a million dollar lawsuit when he offered a purchase price for the land conditioned upon conveyance of marketable title. The dissent and the district court have focused on the wrong issue.

**B.  *Attorney's Fees and Costs***

The contract provided that the prevailing party in any litigation arising out of the contract was entitled to recover reasonable attorney's fees and costs.  Likewise, the Florida civil theft statute, the basis for Count III of Denson's complaint, provided that a defendant is entitled to reasonable attorney's fees and costs if the claim against him is without substantial factual or legal support.  Fla.Stat.Ann. § 772.11.  In addition to finding that Denson breached the contract, the district court also found that Stack did not violate the civil theft statute because he did not know of, counsel or authorize the bank's transfer of the earnest money from the escrow account to his personal account.  The district court then awarded attorney's fees and costs to Stack under the terms of the contract and the civil theft statute.

■  As noted above, Stack was not in a position to convey marketable title after the 120–day period.  Denson then complied with the terms of the contract by demanding return of the earnest money within a reasonable time.  Because Denson is entitled to the return of the $300,000 deposit with interest, he is the prevailing party under the contract in this suit.

Stack's contention that Denson's withdrawal of the specific performance claim during trial makes Stack a prevailing party under the contract is without merit.  The terms of the contract make it clear that only one party may be the "prevailing" party.  The Florida courts have also held that this type of contract allows only one party to prevail.  *Reinhart v. Miller*, 548 So.2d 1176, 1177 (Fla.Dist. Ct.App.1989).  Likewise, a plaintiff who obtains a judgment on one count of a multicount claim is the prevailing party.  *Bill Rivers Trailers, Inc. v. Miller*, 489 So.2d 1139, 1142 (Fla.Dist.Ct.App.1986) (per curiam).  We, therefore, reverse the district court's award of attorney's fees and costs under the contract and remand to the district court to determine the amount of attorney's fees and costs to which Denson is entitled and to award same.

■  We next consider the award of attorney's fees and costs under the civil theft statute.  The civil theft statute, Fla.Stat.Ann. § 772.11, provides a civil remedy for violations of the criminal theft statute, Fla.Stat. Ann. §§ 812.012–812.037 (West Supp.1990).  The criminal theft statute states:

(1) A person is guilty of theft if he knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit therefrom.

(b) Appropriate the property to his own use or to the use of any person not entitled thereto.

*Id.* at § 812.014.

■  Under the terms of the civil statute, the district court was required to find that Denson's claim was without substantial factual or legal support before awarding attorney's fees and costs to Stack.  *Id.* at § 772.-11.  We review the district court's findings for clear error.  Under Florida law, a conversion occurs in violation of the criminal theft statute when a person who has a right to possession of property demands its return, and the property is not relinquished.  *Senfeld v. Bank of Nova Scotia Trust Co.*, 450 So.2d 1157, 1161 (Fla.Dist.Ct.App.1984); see *Rosenthal Toyota, Inc. v. Thorpe*, 824 F.2d 897, 901 (11th Cir.1987).  In this case, the bank acted independently in transferring funds from the escrow account to Stack's personal account and then applying the money to Stack's other debts.  Although Stack was made aware of this transfer by Denson, he refused to return the deposit money back to the escrow account or to Denson.  As noted above, Stack was not entitled to keep the deposit and interest.

Under these circumstances, the district court's finding that Stack was entitled to attorney's fees and costs under the civil theft statute is clearly erroneous.  Even though Denson was not victorious in his civil theft claim, there was substantial factual and legal support for it.  Therefore, we reverse the district court's award of attorney's fees and costs.

## III.  CONCLUSION

The district court improperly concluded that Stack was in a position to convey marketable title to Denson and that Denson did not request the return of the earnest money deposit in a timely manner.  Denson is, therefore, entitled to the return of the deposit and accumulated interest.  The award of attorney's fees and costs to Stack under the contract is reversed because Denson is the prevailing party.  We remand to the district court to determine Denson's attorney's fees and costs and to enter judgment for same.  Finally, the district court improperly awarded attorney's fees and costs to Stack under the civil theft statute.  We REVERSE the district court's judgment and award of attorney's fees and costs and REMAND for further proceedings.

CLARK, Senior Circuit Judge, dissenting:

Respectfully, I dissent.  The majority totally ignores the district court's factual findings, which are amply supported by the record.  Purporting to make its own findings, which are not supported by the record, the majority reaches the erroneous conclusion that Denson, who totally and completely failed to prove his case at trial, should prevail in this action.

Under the contract, Stack was obligated to remove a "defect" in his title *only* if that "defect" rendered the title "unmarketable." [1]  Thus, the issue for the district court was whether the alleged "defect," that is, the State of Florida's failure to admit that it had no interest in Devil's Hammock, rendered Stack's title "unmarketable."  The State's purported claim [2] to Devil's Hammock was based upon its ownership of all lands beneath waters navigable in 1845.  Thus, to determine whether this purported claim was of sufficient substance to render Stack's title

unmarketable, the district court had to decide whether the Waccasassa River as it traverses Devil's Hammock was navigable in 1845.  After hearing all of the evidence presented at trial, the district court found:

> [Stack] had uncontradicted testimony or opinion of a recognized expert that the Waccasassa River, as it traversed the subject property, had never been navigable; that the nearest point to the subject property where the Waccasassa River was considered navigable in 1845, the year of Florida statehood, was eight to nine miles south of [Stack's] southern boundary; that none of the original government survey maps showed a meander line where the river crosses property.

> Now as opposed to this set of facts, plaintiff never offered any evidence that the river was in fact navigable throughout its course across the subject property or ever claimed that the State in fact owned the riverbed.

> The Court finds from the evidence that [Stack's] property was not encumbered by any claim of sovereignty by the State of Florida. [3]

The majority does not point to one piece of evidence that even suggests that this factual finding is clearly erroneous.  Indeed, the majority appears to totally ignore this factual finding, perhaps because the finding is so overwhelmingly supported by the record.

The Waccasassa River runs roughly from north to south, emptying at its southern end into Waccasassa Bay, a small bay off of the Gulf of Mexico.  Two tributaries flow into the Waccasassa approximately five to six miles north of its mouth: Otter Creek enters the Waccasassa from the west about five miles north of the mouth, and the Wekiva River enters the Waccasassa from the east slightly

---

1.  Contract for Sale at ¶ A, Joint Exh. 1.  In the *Matter of Garfinkle*, 672 F.2d 1340, 1345 (11th Cir.1983), we held in reliance on Florida cases: "Marketable title is unencumbered title, free from reasonable doubt as to any question of law or fact necessary to sustain its validity."  An issue is free from reasonable doubt when a litigant cannot point to a fact in the record which would cause a reasonable person to have a doubt.

2.  For ease of reference, I refer to the alleged "defect" as "the State's purported claim."  I use the phrase "purported claim" because, as is discussed later in this dissent, the State has never made a "claim" to ownership of any portion of Devil's Hammock.

3.  R8–11–12.

over a mile north of Otter Creek.[4] A Survey Report prepared by the U.S. Army Corps of Engineers in 1964 describes the Waccasassa as follows:

> Waccasassa River rises in an area of swamps and ponds at elevations of 80 to 100 feet, mean sea level, with poorly defined connecting channels.... Under normal conditions there is no continuous, defined channel in the Waccasassa River above Blue Springs, near Bronson.... Except within the tidal area, most reaches of the river and its tributaries have poorly defined channels in the numerous flat areas.... Navigational use is largely limited to small craft for fishing and recreation in the tidal reaches.

. . . . .

> Navigational use is now limited to small craft for fishing and recreation in the tidal reaches for 6 or 7 miles from the gulf. Rock ledges and sandbars in parts of these channels limit traffic in these reaches to shallow-draft boats. Extremely shallow water in the gulf immediately outside the river mouth limits access to the estuary from that direction.[5]

Stack's property lies inland, far from the "tidal reaches" described in the report quoted above; the southernmost tip of Stack's property lies at least eight or nine miles north of the point where the Wekiva River flows into the Waccasassa.[6] The Waccasassa as it traverses Stack's property is depicted on the plat map as a series of branching water flows, rather than as a well-defined river bed.[7] One of Denson's witnesses described it as follows:

> Q: Mr. Cullison, in 1983, when you first had an observation of the property, were you familiar with the location of the river as it bisected the Devil's Hammock property?
>
> A: I knew that there was a creek there. I knew that there was water on the property, yes.
>
> Q: And what did you know about that particular water on the property?
>
> A: Well, I knew that they called it the Waccasassa River, but it was just low wetlands. I mean, there wasn't any place that I saw that for more than a hundred yards you might be able to put a canoe in it or something; but, to me, it looked like the head water of a river that—you know, where the river first starts.[8]

The only surveyor who testified at trial described the waterway as follows:

> I would refer to it as a creek rather than a river. It's a very highly braided river or creek, in that there is no one single main channel through a great portion of it and it's in several braids and individual channels.[9]

Another of Denson's witnesses testified that "between the flows of the river, there is hardwoods of adequate size that you can't get your hands around them, that are six feet apart."[10] Clearly, the Waccasassa as it traverses Stack's property is not now navigable; Denson submitted absolutely no evidence to the contrary.

The factual question for the district court, of course, was whether this waterway was navigable in 1845. The starting point for determining the navigability of a given waterway in the mid-nineteenth century is contemporaneous government surveys. The government surveyors who prepared these official surveys in the early and mid-nineteenth century were instructed to identify all navigable waters by using "meander lines."[11]

---

4. Joint Exh. 132.

5. Joint Exh. 84 at 3 and 7.

6. *See* text accompanying notes 22 and 23.

7. Plaintiff's Exh. 9, Exh. B.

8. R4–38–39.

9. R6–32.

10. R5–165.

11. *See State of Florida, Department of Natural Resources v. Bronsons, Inc.,* 469 So.2d 214, 215 (Fla.App. 5 Dist.1985) ("The government surveyor was under a duty to ascertain all permanent natural navigable waters constituting sovereignty lands and to meander them so as to identify them and distinguish them for all time from lands of other character."); *see also Goodman v. City of Crystal River,* 669 F.Supp. 394, 398 (M.D.Fla. 1987) ("The surveyors [who prepared an 1846 survey by the General Land Office] were instructed to meander all navigable water bodies."). A

Accordingly, a meander line on one of these government surveys is evidence that creates a rebuttable presumption that the water body meandered was navigable at the time the survey was prepared.[12] Conversely, a water body is deemed non-navigable in the absence of evidence of navigability.[13] Thus, a government survey with no meander line for a given water body creates a rebuttable presumption that the water body was not navigable at the time the survey was prepared.[14]

In this case, the parties stipulated that, "As to Devil's Hammock, the government surveys of 1826, 1835, 1845, and 1853, reflect that the Waccasassa River was not a meandered watercourse."[15] Thus, the district court began with a rebuttable presumption that the Waccasassa as it traverses Stack's property was *not* navigable in 1845. Denson presented absolutely *no* testimony to rebut this presumption; he did, however, present two documents that have some bearing on the navigability of the Waccasassa in 1845.

The first of these two documents is a work sheet dated November 15, 1989, apparently prepared by a State employee. This work sheet contains the following notation:

Records show that [Waccasassa River and Otter Creek] are non-meandered waterbodies. Waterbodies appear to be navigable streams from Field Notes and Plats; however, *records unable to document navigability.*[16]

The second of these two documents is an undated letter to Denson from Tom Gardner, a state employee. The letter reads, in pertinent part:

The records reflect that there was steamboat and other commercial traffic on the Waccasassa River at the time of statehood. Therefore, the Waccasassa River is a navigable state-owned waterbody. The extent of the state's ownership is to the line of ordinary high water. While the head of navigation is not known, the records support a finding that navigation was possible and did occur on the Waccasassa River for the entire length of Levy County and into Gilchrist County.

A summary of the results of the Division's research is attached. The source of each document is noted in the event you wish to examine them yourself.

If I or any member of my staff may be of additional assistance, please contact me.[17]

The attached summary lists 15 historical sources, some of which indicate that there was river traffic on the Waccasassa in the nineteenth century. Stack provided a copy of Gardner's letter and the attached summary to Dr. Edward Keuchel. Dr. Keuchel is a professor of history at Florida State University who specializes in the history of Florida. He has published articles regarding

---

meander line "is a series of continuous straight line segments drawn to depict the sinuosities of the shorelines of navigable water bodies." *Board of Trustees of the Internal Improvement Trust Fund v. Florida Public Utilities Co.,* 599 So.2d 1356, 1357 n. 2 (Fla.App. 1 Dist.), *review denied,* 613 So.2d 4 (Fla.1992).

**12.** *Odom v. Deltona Corp.,* 341 So.2d 977, 988–89 (Fla.1976).

**13.** *Id.* at 989.

**14.** *See Florida Public Utilities Co.,* 599 So.2d at 1357. *But see Bronsons,* in which the Florida Fifth District Court of Appeals held that a contemporaneous government survey showing that the water body in question was not meandered was *conclusive* as to the question of navigability. 469 So.2d at 215. *Bronsons* is inconsistent with the Florida Supreme Court's decision in *Odom* and with the First District Court of Appeal's decision in *Florida Public Utilities;* both of these

decisions indicate that a contemporaneous government survey showing that a water body is not meandered creates a *rebuttable* presumption of non-navigability. *Odom,* 341 So.2d at 989; *Florida Public Utilities,* 599 So.2d at 1357.

**15.** R2–49–28, ¶ 96; *see also* Joint Exh. 60, which indicates that these four surveys were prepared by the federal General Land Office.

**16.** Joint Exh. 66 (emphasis added).

**17.** Joint Exh. 132. This letter is the only basis of the majority's assertion that title to the property is unmarketable. *See* Majority Op. at 8. The trial of the case was devoted to a factual inquiry as to whether the Waccasassa was navigable in 1845 or at any time *through the land subject to the litigation.* Notwithstanding the undisputed proof that the river was not navigable as asserted by this letter, the majority insists that the State has a claim to Stack's property.

Florida property issues and has been retained in property litigation to make navigability determinations. Stack had retained Dr. Keuchel to determine whether the Waccasassa as it traverses Devil's Hammock was navigable in 1845. Dr. Keuchel conducted his own independent research, reviewed each of the sources in the State's summary, and conversed with the Joe Knetsch, the State's historian, whom Dr. Keuchel knew well.[18] After completing his research, Dr. Keuchel concluded:

> I can find no historical evidence that the Waccassassa [sic] River, as of 1845, was navigable upstream of the general area where the Wekiva River enters it. It seems to me that the best course to follow is to accept what the people of the mid 19th century stated—that the Waccasassa is navigable up to Otter Creek.[19]

In support of this conclusion, Dr. Keuchel prepared an analysis in which he discussed each of the 15 sources listed in the State's summary and explained why these sources indicate only that the Waccasassa was navigable up to the point where the Wekiva enters it; not one of the sources indicates navigability north of the Wekiva.[20] At trial, Dr. Keuchel explained why the *absence* of any mention of the navigability in these historical sources indicates that the river was not in fact navigable:

> Joe [Knetsch] and I had just talked about that several times and essentially the question is that we both agree that the lower regions of the Waccasassa River is a navigable river. In addition, when you start moving upstream, at what point the [Department of Natural Resources] seems inclined to accept that wherever there's water, that the river is navigable. I don't hold to that.
>
> 1845, the year in question, was a period in American history when river transportation was right at its height. So the people back in the middle of the 19th Century were very much interested in the question of whether rivers could be navigated or

not. Simply put, in terms of hauling goods, if it has to go over land, it cost 20 times as much as if it could go by water. So this is something that is very real. Florida didn't have much in the way of railroads in 1845. It was one little mule run there that ran from Tallahassee down to St. Marks. Prior to the building of railroads, it really didn't come on the scene until the mid–1850s. So that Florida was very much dependent on water transportation when you could do it. So that there was a great desire to transport by water. The early description of the land that the [Department of Natural Resources] has that I looked initially at, this was a real question for the people to look at at that time. When they were describing river, were those rivers navigable? There certainly was no indication that the Waccasassa River was.[21]

In his trial testimony, Dr. Keuchel stated his conclusion as follows:

> [I]t was my conclusion that the Waccasassa River is indeed a navigable river in its lower section.
>
> The people that wrote about it and described it in the period right before the kind of statehood, and for some years thereafter, do indeed talk about the Waccasassa River being navigable. The area called Otter Creek where the Wekiva comes into the Waccasassa, these were the areas that were specifically mentioned that were navigable. I was unable to find any evidence that the Waccasassa was navigable, navigated, or susceptible of navigation in the Devil's Hammock area as of the 1840s. It looks, from my perspective, that the people in the 1840s talked in terms that where the Wekiva enters the Waccasassa, perhaps a half mile north of that would be regarded as the head of navigation in the Waccasassa. That's clearly south of the region that's identified as the Devil's Hammock.[22]

**18.** R6–72–78.

**19.** Joint Exh. 122.

**20.** *Id.,* Attach.

**21.** R6–82–83.

**22.** R6–76–77.

Dr. Keuchel concluded that the Waccasassa was navigable, at most, only to a point a half of a mile north of the Wekiva. This point is eight or nine miles south of the southernmost tip of Stack's property.[23]

There is no evidence that the State ever had any information that would undermine Dr. Keuchel's conclusion. At trial, Stack's attorney, who was called as a witness by Denson, testified as to his conversations with Tom Gardner regarding the navigability of the Waccasassa across Stack's property:

Q: Now in your examination by counsel when he asked you about [Gardner's letter], you said that you had subsequent discussions with Gardner with the State about the information that he sent you [in the letter].

A: Yes, sir.

Q: What were those discussions and when did they take place?

A: The discussions dealt with the historical background for the inclusion in his letter of the language that [counsel] read to you. And we delineated, you know, that these items specifically related to the lower portion of the river, only.

Q: Did Mr. Gardner concede that?

A: Well, Mr. Gardner was in the position that he said, you know, he preferred me to discuss that matter with the State historian, hired by the Department of Natural Resources, but he said that his conclusion was based on the backup material contained in here, only.

A: Did he provide you with any additional information related to the area between the eight and a half or nine mile stretch to get to Mr. Stack's property?

A: No. They did not have any. We inquired and asked and it wasn't available.

. . . . .

Q: . . . you had a meeting with Mr. Gardner?

A: Yes.

Q: Was he able to pinpoint a single fact that the State had to establish navigability on the Stack property?

A: His historian was present, our historian was present, and we asked the historian, it was a State historian, if he had any additional facts.

And the historian indicated that he did not, and that *the only thing he could say, Mr. Gardner, was that, well, it might have been possible that it wasn't navigable on the Stack property in 1845.*

Q: That's as strong or as weak as they got, that it might have been possible?

A: Yes, sir.[24]

Although Denson included Gardner in his witness list in the pretrial stipulation,[25] he did not call Gardner as a witness at trial. Denson did not call the State historian to testify on his behalf, nor did he have his own historical expert. In his letter, Gardner specifically offered his assistance and that of any member of his staff.[26] Most assuredly, Denson could have offered evidence as to the navigability of the Waccasassa in 1845 (or at any other time) if such evidence was in the possession of Gardner or any of his staff. There is absolutely nothing in the record before us to undermine Dr. Keuchel's conclusion that the Waccasassa in 1845 was navigable only as far north as the Wekiva. On this record, I fail to see how the majority can possibly conclude that the district court's factual finding as to navigability is clearly erroneous. I would uphold the district court's conclusion that the Waccasassa River as it traverses Stack's property was not navigable in 1845.

This does not end the inquiry. I can conceive of a situation in which the State's insistence on pursuing an untenable claim to a piece of property may create such a real hazard of protracted and expensive litigation as to render the property unmarketable. This, however, is not such a situation. While the State's posturing during the events leading up to this lawsuit may indicate some abuse of state power, I see no evidence in the

---

23. R5-98-100.

24. R5-100-101; R5-166 (emphasis added).

25. R2-49.

26. *See* text accompanying note 17.

record that the State has, and nothing in the record to indicate that the State ever will, actually make a "claim" to Devil's Hammock.

Stack's attorney first contacted the State regarding the Waccasassa in an effort to satisfy Denson's concern over the wetlands exception in the title commitment. The State at first refused to take any position whatsoever as to its rights to Devil's Hammock. In a letter dated September 27, 1989, the State conceded that, because the Waccasassa was not a meandered water body, there was no presumption of navigability; the State went on to say: "At the present time, the Division of State Lands has not undertaken a review of the historical records to determine whether evidence of navigability does in fact exist. Therefore, no disclaimer of State ownership is warranted or authorized." [27]

The State eventually had one of its historians look into the question of the navigability of the Waccasassa in 1845. Thereafter, Gardner wrote his undated letter, quoted above. [28] This carefully worded letter is not a "claim" to any specific portion of Stack's property, as the majority asserts. Rather, it was further posturing by the State in an apparent attempt to avoid admitting that there was *no* evidence that the Waccasassa as it traverses Stack's property was ever navigable. As is discussed above, the historical sources to which Gardner's letter refers indicate only that the Waccasassa was navigable in its lower sections, far south of Stack's property. Only one statement in Gardner's letter can be construed as referring to the Waccasassa as it traverses Stack's property: "While the head of navigation is not known, the records support a finding that navigation was possible and did occur on the Waccasassa River for the entire length of Levy County and into Gilchrist County." According to uncontroverted testimony at trial, this statement is erroneous not only because the records do not support a finding of

navigation above the lower sections of the river, but also because, according to the State's own information, the Waccasassa does not even extend into Gilchrist County. [29] Moreover, as is discussed above, State officials conceded in a meeting with Stack's attorney that the Waccasassa as it traverses Stack's property may not have been navigable in 1845. Although the State apparently declined to put this concession in writing, I fail to see how the single ambiguous and erroneous statement in Gardner's letter can be construed as a "claim" by the State to a portion of Stack's property. [30]

There is evidence in the record that sheds some light on the State's unreasonable conduct in this matter. In testifying regarding his efforts to resolve the navigability issue with the State, Stack's attorney said:

A: Well, quite frankly, the reason that some of the—you see, the State had acquired substantial portions of the lower part of the Waccasassa River, and in that acquisition, some of the officials in the [Department of Natural Resources] did some improper acts and the Director went to jail for it. So—

Q: This was before your meeting on December 15th [1989]?

A: Oh, yes, sir, several years earlier. They were very careful about their approach to the Waccasassa River. [31]

The State declined to do what it should have done in the absence of any evidence of navigability of the relevant portion of the Waccasassa; it refused to admit that it had no interest in Stack's property. Although wrongful, I fail to see how the State's conduct, in the absence of any evidence either to support a purported claim or to indicate that the State would ever actually make a claim, could possibly render Stack's property unmarketable. The majority has not pointed to, and I have not found, any evidence in the record to justify overturning the district

**27.** Joint Exh. 47.

**28.** *See* text accompanying note 17.

**29.** R5–101–102.

**30.** Indeed, the majority even refers to "the State of Florida's possible claim" and "the threatened

claim by the State of Florida," thereby implicitly recognizing that the State never affirmatively asserted any claim to Stack's property.

**31.** R5–125.

court's determination that the property was marketable.

The record simply does not support a reversal of the district court's determination in this case. While the State's posturing in this matter was unfortunate, it did not render Stack's title unmarketable. There is no evidence that the State has or ever had any intention of affirmatively asserting the untenable position that it has an interest in Stack's property. Nevertheless, the majority concludes that the State's posturing was sufficient to render Stack's property unmarketable. The majority's opinion sets a dangerous precedent: it holds that any veiled threat to make a claim, no matter how preposterous, to a piece of property will be sufficient to render the property unmarketable. This is not, and should not be, the law. Accordingly, I dissent.